# HEALTH INSURANCE PLAN OF GREATER NEW YORK v DEPARTMENT OF INSURANCE AND TREASURER

## Case No. 88-2829

State of Florida, Division of Administrative Hearings

January 13, 1989

### APPEARANCES OF COUNSEL

**Robert L. Shevin,** and **Allen J. Friedman,** Stroock, Stroock and Lavan, for petitioner.

**Rainell Y. McDonald,** and **Sharon N. Jacobs,** Office of Legal Services, for respondent.

### OPINION OF THE COURT

WILLIAM R. DORSEY, JR., Hearing Officer.

#### *RECOMMENDED ORDER*

This matter was heard by William R. Dorsey, Jr., the Hearing Officer designated by the Division of Administrative Hearings, in Fort Lauderdale, Florida, on September 15, 1988. The parties have filed proposed findings of fact and conclusions of law. Rulings on proposed findings of fact are made in the appendix to this recommended order.

## ISSUE

The issue is whether Health Plan of Greater New York, Inc., qualifies as a guarantor of minimum surplus requirements of HIP Network of Florida, Inc., a Florida health maintenance organization.

## FINDINGS OF FACT

### A. General background

1. Health Insurance Plan of Greater New York (HIP) has filed an application to qualify as the guarantor of the minimum surplus requirements for a Florida health maintenance organization which had been known as Network Health Care, Inc. HIP acquired control of Network Health Care, Inc., in June, 1987. It then became known as HIP Network of Florida, Inc. After reviewing the application, on April 28, 1988, the Department of Insurance and Treasurer denied the request because it determined that HIP did not have the minimum surplus required by Section 641.225(2), Florida Statutes, to become a guarantor.

2. HIP is a not-for-profit corporation organized under the laws of the State of New York. It is a certified health maintenance organization in New York, operating under the provisions of Article 43 of the Insurance Law of the State of New York and Article 44 of the Public Health Law of the State of New York.

3. HIP was founded in 1944. It was organized by New York Mayor LaGuardia to assist city workers in obtaining health care at a reasonable cost. Doctors returning from military service after World War II were recruited to work at medical facilities on a prepaid basis so that city workers could obtain medical care. HIP became one of the first prepaid group health plans in the nation. It now has approximately 900,000 members in the State of New York. HIP has also affiliated with HIP of New Jersey, which has approximately 71,000 members, and HIP Network of Florida, which has approximately 13,000 members. The total membership therefore is approximately one million members.

4. HIP of New York is among the five largest health maintenance organization in the United States, with current earned premiums of approximately $700 million. It is considered a well-managed not-for-profit health maintenance organization.

5. Many members of HIP of New York retired to Florida. At the request of labor unions and employers, HIP of New York decided to provide health care services in Florida. It met with representatives of a

182

Florida health maintenance organization, Network Health Care, Inc., to discuss a possible merger or acquisition. A contract was executed in December 1986, which would provide HIP of New York with control of Network Health Care. That transaction closed in June 1987, after regulatory approval for the acquisition was obtained from the State of Florida. Network Health Care then became known as HIP Network of Florida, Inc.

6. On April 25, 1988, the chief financial officer of HIP wrote to the Florida Department of Insurance and treasurer seeking permission to qualify as a guarantor of the minimum surplus requirements for HIP Network of Florida, Inc., which did not itself meet Florida's minimum surplus requirements for HMOs. The Department and HIP have stipulated that Section 641.225(2), Florida Statutes, requires that HIP have a minimum surplus of $2 million to qualify to guarantee the surplus for HIP Network of Florida, Inc.

*B. The financial status of Health Insurance Plan of New York*

7. As of December 31, 1987, according to an audit performed by an independent auditor, Touche, Ross & Company, the property, plant and equipment owned by HIP had a value of $93,210,000. This is composed of $7,588,000 in land; $45,978,000 in buildings and improvements; $21,110,000 in leasehold improvements; $37,994,000 in equipment, furniture and fixtures; and $13,888,000 in construction in progress. These components of property, plant and equipment are valued at cost, less accumulated depreciation. Depreciation is computed according to the straight line method based on the estimated useful lives of assets. Accumulated depreciation for the assets is $33,348,000, which yields the value of property, plant and equipment of $93,210,000.

8. The assets of HIP are not limited to property, plant and equipment, of course. It also had, on December 31, 1987, the following current assets: cash in the amount of $11,646,000; marketable securities, which had a cost of $89,387,000; premiums receivable of $58,089,-000 and other current assets of $17,169,000. As of December 31, 1987, its balance sheet showed current assets of $176,291,000.

9. Total assets include more than current assets, and property, plant and equipment. Using generally accepted accounting principles, HIP's total assets as of December 31, 1987, were $319,597,000.

10. HIP's December 31, 1987, balance includes the organization's liabilities and reserves. It had current liabilities of $143,267,000, and long-term debt in the amount of $72,531,000. The organization had other liabilities, so that its total reserves for protection of subscribers (which is basically its net worth) was $82,948,000. For ease of refer-

**183**

ence, the balance sheet of the organization (without the accompanying notes) follows:

### HEALTH INSURANCE PLAN OF GREATER NEW YORK
### BALANCE SHEETS
(In thousands)
### A S S E T S

| | December 31, | |
| --- | --- | --- |
| | *1987* | *1986* |
| CURRENT ASSETS: | | |
| Cash | $11,646 | $3,025 |
| Marketable securities, at cost | 89,387 | 112,370 |
| Premiums receivable | 58,089 | 52,817 |
| Other current assets | *17,169* | *21,797* |
| TOTAL CURRENT ASSETS | $176,281 | $190.009 |
| ASSETS HELD BY TRUSTEE WHOSE USE IS RESTRICTED | $10,119 | $19,537 |
| OTHER ASSETS | 21,387 | 7,463 |
| DEFERRED REMUNERATION ASSETS (Note 4): | | |
| Marketable securities, at cost (Note 2) | 18,590 | 16,221 |
| PROPERTY, PLANT AND EQUIPMENT, | | |
| less accumulated depreciation and amortization | *93,210* | *78,985* |
| | $319,597 | $312,215 |

### LIABILITIES AND RESERVES

| | | |
| --- | --- | --- |
| CURRENT LIABILITIES: | | |
| Payable to medical groups | $11,355 | $16,714 |
| Accrued interest payable | 874 | 916 |
| Accounts payable and other accrued expenses | 16,662 | 21,025 |
| Accrued liabilities for claims payable | 94,162 | 78,029 |
| Premiums received in advance | 15,546 | 17,582 |
| Current portion of long-term debt | *4,668* | *4,818* |
| TOTAL CURRENT LIABILITIES | $143,267 | $139,084 |

| | | |
|---|---:|---:|
| DEFERRED REMUNERATION LIABILITY | 18,590 | 16,221 |
| LONG-TERM DEBT | 72,531 | 77,801 |
| COMMITMENTS | | |
| RESERVES FOR TELEPHONE AND MEDICAL EQUIPMENT | 2,261 | 6,180 |
| RESERVES FOR PROTECTION OF SUBSCRIBERS | *82,948* | *72,929* |
| | $319,597 | $312,215 |

### C. Liquidity

11. The application of HIP to be a guaranteeing organization for HIP Network of Florida raises the issues of the liquidity of HIP. Ordinarily, an HMO must have its own surplus. The purpose of the statute's guarantee provision is to require the guarantor to protect the interests of the subscribers of the guaranteed HMO by paying claims of those subscribers should the guaranteed HMO become unable to meets its obligation.

12. In general terms, HIP is a rather liquid company since it has more than $100 million in cash and marketable securities (valued at cost). Some of those securities are, however, already pledged. For example, HIP has obtained a working capital line of credit for an affiliated company, HIP Hospital of Long Island, Inc., in the amount of $1.7 million which is secured by HIP's marketable securities. It also has a standby letter of credit with HIP Hospital of Long Island, Inc., in the amount of $876,000 secured by HIP's marketable securities. Even reducing marketable securities on HIP's balance sheet by the amount of those securities which are pledged, the company has cash and marketable securities of about $98,400,000.

13. A commonly used measure of liquidity of an entity is "working capital," *i.e.,* the amount of available liquid assets to meet current obligations that will become due in a 12-month period. The audited financial statement of HIP shows that for the period ending December 31, 1987, total assets of $176,291,000 and current liabilities of $143,267,000, which yields working capital of $33 million.

14. HIP's reserves for the protection of its subscribers of $82 million are approximately $44 million greater than the statutory reserve requirements of the State of New York, as of December 31, 1987. These reserves include reserve for Capital Funds. Under New York law, the use of these funds are limited to the purchase or construction

**185**

of facilities for the conduct of HIP's business. This would leave approximately $38 million in unrestricted reserves. Over the four years that Touche, Ross & Company have been the independent auditor for HIP, the reserves of HIP have been strong and have steadily increased.

### D. Other indicia of financial strength

15. When HIP obtained additional financing in 1985 and when it restructured some of its debt in 1988, HIP's financial position was found to be solid by the various state bonding authorities, bond insurance companies and other entities which reviewed HIP's financial standing in connection with the issuance of bonds for HIP. Covenants and indentures for HIP's bonds prohibit HIP from becoming a guarantor for any other entity unless certain conditions are met for the bondholder's protection. As of the date of its audited financial statements, HIP complied with those restrictions and could become guarantor for HIP Network of Florida.

### E. Property, plant and equipment

16. The $72 million of long-term debt of HIP is related to the $93 million of property, plant and equipment which is composed of the medically related facilities which HIP owns.

17. By the nature of its business (providing health care to subscribers), the assets of HIP includes a great deal of property, plant and equipment. A property and casualty insurer, or a life insurance company would need much less in the way of property, plant and equipment to carry on its business, and would have a correspondingly larger investment portfolio of marketable securities.

18. There are three companies that have qualified in the State of Florida as guarantors of the surplus requirements for HMOs pursuant to Section 641.225(2), Florida Statutes. All of those guarantors are insurance companies which do not have major assets in property, plant and equipment.

19. Kaiser Permanente is the largest health maintenance organization in the United States. It has about five million members; most of them reside in California. It is considered the most financially viable health maintenance organization in the United States. Its reserves, stated in terms of net worth, would be approximately $1,535,020,000. Nonetheless it would be unable to qualify as a guaranteeing organization under the Department of Insurance's interpretation of Chapter 641. Kaiser's property, plant and equipment of $2,585,000 would be excluded by the Department when computing its surplus, but the Department would not likewise exclude Kaiser's long-term debt attributable to that prop-

erty, plant and equipment. The calculation would show that Kaiser had a significant deficit. On the other hand, if the medical and patient related property of Kaiser were included as an asset, Kaiser would qualify as a guaranteeing organization under Florida law. HIP made this comparison in an effort to show the law in the Department's statutory analysis in this case.

### F. HIP's cash infusions in HIP Network of Florida

20. Since HIP acquired Network of Florida as an affiliate, HIP has infused approximately $12,000,000 in cash to assist HIP Network of Florida to pay claims and operating costs. HIP is currently assisting HIP of Florida in meetings its obligations; the amount to do so has varied from month to month but has recently been running a couple of million dollars a month. HIP Network of Florida is meeting its ongoing obligations, and paying properly presented claims within 21 days.

### CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over this matter. Section 120.57(1), Florida Statutes (1987).

At the time of HIP's application, Section 641.225(1), Florida Statutes, required that each health maintenance organization operating in Florida maintain a minimum surplus in the amount of $100,000 or five percent of total liabilities, which is greater, to assure the payment of subscribers' claims. A certificate of authority to operate an HMO is only granted to entities which meet the surplus requirement. Section 641.22(3), Florida Statutes. The statute contains an alternative, however, which permits a health maintenance organization which cannot, itself, meet the minimum surplus requirements to provide a written guarantee by an organization which meets the requirements of Section 641.225(2)(a), Florida Statutes, for the same purpose. The guarantor must be an organization which:

"has been in operation for five years or more and has a surplus, *not including land, buildings, and equipment* of the greater of $2 million or two times the minimum surplus requirements of the health maintenance organization. In any determination of the financial condition of the guaranteeing organization, the definition of assets, liabilities, and surplus set forth in this part [part II of Chapter 642, Florida Statutes] shall apply, except that investments in or loans to any organization guaranteed by the guaranteeing organization shall be excluded from surplus." Section 641.255(2)(a), *Florida Statutes.* (emphasis added)

**187**

There is no definition of the terms "assets" or "liabilities" in the definition section of Part II of Chapter 641. Section 641.19(11), Florida Statutes, defines "surplus" as:

[T]otal assets in excess of total liabilities, except that assets pledged to secure debts not reflected on the books of the health maintenance organizations shall not be included in surplus. Surplus includes capital stock, capital in excess of par, other contributed capital, retained earnings, and surplus notes.

There is a different between how financial statements are prepared under generally accepted accounting principles and the way in which the financial affairs of insurance companies are regulated by statute. Section 641.35(1), Florida Statutes, sets out the types of assets for health maintenance organizations that are "allowable" for regulatory purposes. Section 641.35(3) explains the proper means of reporting a health maintenance organization's liabilities, and describes those liabilities which are to be charged against an HMO's allowable assets. Section 641.35(10), Florida Statutes,[1] describes the property in which a health maintenance organization may invest.

Section 641.225(2)(a), Florida Statutes, excludes land, buildings and equipment from the general definition of "surplus" which is found in Section 641.19(11), Florida Statutes, and which is quoted above. Section 641.225(2)(a) is a specific statute defining the surplus required of a guaranteeing organization; it controls over the general definition of surplus found in Section 641.19(11), Florida Statutes. This legislative choice has the effect of making it easier for a property and casualty insurance company or a life insurance company to qualify as a guarantor because those companies have less in the way of land, buildings and equipment which is excluded from their total assets when determining their statutory surplus. Conversely, health insurers are at a relative disadvantage in attempting to qualify as guaranteeing organizations. They have heavy investments in land, building and equipment by the nature of their business, but these assets are excluded from their total assets in determining *whether they have the* required statutory surplus.

The surplus requirement set out in Section 641.225 and incorporated in Section 641.22(3), Florida Statutes, was enacted to insure that no health maintenance organization operates in Florida unless it has a sufficient surplus to pay the claims of its subscribers. Liquidity, the availability of cash to pay claims of HMO subscribers, is essential. The

---

[1] The meaning of Section 641.35(10) is opaque because the introductory language before subsections (a)-(c) contains no predicate.

188

necessary liquidity is prescribed as a surplus of $100,000 or five percent of total liabilities. When a health maintenance organization either cannot or chooses not to maintain this statutory surplus, the subscribers are protected only by the liquidity of the guaranteeing organization. Requiring a guaranteeing organization to have a surplus of $2 million or two times the minimum surplus requirements for health maintenance organizations, without considering the guarantor's holdings in land, buildings and equipments reflects a conservative legislative approach to assure prompt payment of the guaranteed health maintenance organization's subscriber's claims. The statute requires that guarantors have assets which may be quickly converted to cash if called upon to meet subscriber claims. Land, buildings and equipment are not liquid. The legislative decision to exclude them in establishing the requirements for guaranteeing organizations is one rational approach to insuring that health maintenance organizations' subscribers claims are paid promptly.

HIP maintains that the proper interpretation of Section 641.225(2)(a) is that business assets, such as land, buildings and equipment are excluded from the calculation of a proposed guarantor's surplus only to the extent that they are not otherwise included in the definition of "assets" found elsewhere in Chapter 641. The description of allowable assets found in Section 641.35(1)(b), Florida Statutes, indicates that "properties" owned by health maintenance organizations are allowable assets for regulatory purposes, but that provision does not override the exclusion of land, buildings and equipment in computing the surplus of a guarantor. The word "property" appears in the description of "property used in the health maintenance organization's business" found in Section 641.35(10), Florida Statutes, but that term of art does not appear in Section 641.225(2)(a) and thus has no bearing on the question at issue here.

When determining whether a guaranteeing organization qualifies under Section 641.225(2)(a), Florida Statutes, after excluding land, building and equipment from total assets, the corresponding liabilities attributable to the excluded assets are not excluded. To ignore the amounts owed on the land, buildings and equipment would, in part, defeat the legislative purpose achieved by excluding those assets from the surplus computation. The liability for debts owed on land, buildings and equipment remains, must be paid, and must be taken into account when assessing the organization's liquidity.

From an ordinary accounting prospective, this statutory requirement may be said to involve a type of double accounting. It deducts the amounts owed on property, plant and equipment from the business'

total assets, yet it does not count the value of those assets among the organizations' holdings. The principal witness who testified on behalf of HIP was an audit partner from its independent auditor, Touche, Ross & Company. The choice the legislature made in establishing the requirements for a guaranteeing organization are, in his view, at odds with generally accepted accounting principles. To one schooled in accounting, the choices may even be wrongheaded. The legislature is not required to follow generally accepted accounting principles in its regulatory policies, however. It is not even necessary that the legislature permit health maintenance organizations such as HIP Network of Florida which do not meet the minimum surplus requirements of Section 641.225(1), Florida Statutes, themselves to remain in business.

The testimony from the Department demonstrates that the Department first looks to the general definition of surplus in Section 641.19(11), Florida Statutes, then returns to Section 641.225(2)(a), Florida Statutes, and applies that statute to narrow the assets considered in computing the surplus of guaranteeing organizations. Section 641.225(2)(a) excludes lands, buildings and equipment from the general definition of surplus found in Section 641.19(11). Nothing in the statutes indicates the legislature also intended to exclude the liabilities attributable to excluded assets in determining whether an entity should be permitted to guarantee the debts of a health maintenance organization.

The proper interpretation of Section 641.225(2)(a), Florida Statutes, which excludes land, building and equipment from the assets of a proposed guarantor, but includes all its liabilities in determining the surplus results in the following calculation in this case:

| | |
|---|---:|
| Total Assets | $319,597,000 |
| Less: land, buildings and equipment | 93,210,000 |
| Net Assets | 226,387,000 |
| Less Total Liabilities | 236,649,000 |
| Surplus (Deficiency) | (10,262,000) |
| Required Surplus | *2,000,000* |
| Deficiency in Required Surplus: | ($12,262,000) |

To qualify as a guaranteeing organization for HIP Network of Florida, HIP must have a surplus of $2 million but its statutory surplus is a negative $10,262,000 by operation of Section 641.225(2)(a), Florida Statutes.

The infusion of funds into HIP Network of Florida by HIP, and the

continued willingness of Health Insurance Plan of Greater New York to provide funds has no bearing on its qualification to act as a guarantor under Section 641.225(2)(a), Florida Statutes.

## RECOMMENDATION

It is recommended that the application submitted by Health Insurance Plan of Greater New York to be approved by the Department of Insurance as a qualified guaranteeing organization for HIP Network of Florida pursuant to Section 641.225(2)(b), Florida Statutes, be denied.

DONE AND ENTERED in Tallahassee, Leon County, Florida, this 13th day of January, 1989.